## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

HOSPICE OF NEW MEXICO, LLC,
a New Mexico Corporation,

       Plaintiff,

vs.                                 No. CIV 09-00145 RB-LFG

KATHLEEN SEBELIUS, Secretary of
the United States Department of
Health and Human Services,

       Defendant.

### MEMORANDUM  OPINION

**THIS MATTER** came before the Court on the parties' cross-motions for summary judgment. (Docs. 13 & 15.)  For the reasons set forth below, the Court finds that 42 C.F.R. § 418.309(b)(1) is invalid and should be set aside, Plaintiff's Motion for Summary Judgement/Stay (Doc. 15) is GRANTED, and Defendant's Motion for Summary Judgment (Doc. 13) is GRANTED IN PART and DENIED IN PART.

## I.      PROCEDURAL BACKGROUND

The case involves the validity of federal regulation 42 C.F.R. § 418.309(b)(1), promulgated by the Secretary of the Department of Health and Human Services.  The Department of Health and Human Services (HHS) is the federal agency responsible for administering Medicare and reimbursing hospice care providers for services given to Medicare beneficiaries.

Plaintiff filed a Complaint (Doc. 1) in this matter on February 13, 2009, and an Amended Complaint (Doc. 11) on August 25, 2009.  In a joint status/scheduling conference conducted July 27, 2009, the parties agreed that the matter could be resolved through summary judgment, as the case

primarily involves a legal question—the validity of 42 C.F.R. § 418.309(b)(1). (Doc. 9.)  A Joint Notice of Briefing Complete (Doc. 28) was filed on October 20, 2009.  Oral argument was held on February 25, 2010.

## II.  STATEMENT OF FACTS

Plaintiff Hospice of New Mexico requests that this Court invalidate federal regulation 42 C.F.R. § 418.309(b)(1), which sets out the rules for calculating the statutory cap on Medicare reimbursements available to hospice care providers who provide services to terminally ill Medicare beneficiaries.  Plaintiff asserts that the regulation is invalid and contrary to Congress' statutory mandate under 42 U.S.C. § 1395f(i)(2)(C), that it is arbitrary and capricious, and that it amounts to an unlawful taking in violation of the Fifth Amendment.  Prior to addressing the parties' arguments with respect to the validity of 42 C.F.R. § 418.309(b)(1), a brief review of the history of Medicare benefits for hospice care is in order.

### A.  Hospice Medicare Benefits and the Statutory Cap

In 1982, Congress amended the Medicare Act to provide coverage for hospice care. *See* Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 122, 96 Stat. 324 (codified at 42 U.S.C. § 1395c).  In order to receive Medicare benefits for hospice care, a Medicare beneficiary must be terminally ill, meaning that the "individual's life expectancy is 6 months or less." 42 U.S.C. § 1395x(dd)(3)(A).  If a terminally ill Medicare beneficiary elects to receive hospice care, he or she waives all rights to Medicare payments for treatments of the underlying illness. 42 U.S.C. § 1395d(d)(2)(A).  To continue to receive benefits for hospice care, the Medicare beneficiary must elect hospice care for subsequent benefit periods; the first two periods last ninety days, and any subsequent periods last sixty days. 42 U.S.C. § 1395d(d)(1).  There is, however, no limit on the number of benefit periods for which a Medicare beneficiary may request hospice care. 42 U.S.C.

2

§ 1395d(a)(4) and (d)(1).   The only requirement is that each election be accompanied by a certification from the patient's physician that he or she is suffering from a terminal illness. 42 U.S.C. § 1395f(a)(7).

The amount that Medicare will reimburse a hospice care provider—such as Plaintiff Hospice of New Mexico—is limited by an annual statutory cap. *See* 42 U.S.C. § 1395f(i)(2)(A).   Any payments made to a hospice care provider during a fiscal year in excess of the statutory cap must be returned to Medicare.[1]   The fiscal year for hospice care providers—i.e., the period for which the Medicare reimbursements are calculated—runs from November 1 to October 31.   Congress' intent in enacting such a benefits cap for hospice care was to ensure that Medicare would not expend more money in a year for hospice care than what would be expended in treating a patient in a traditional setting. *See* H.R. Rep. No. 98-333, at 1 (1983), *reprinted at* 1983 WL 25325.

To calculate a hospice care provider's annual reimbursement cap, HHS takes the *per patient cap* and multiplies it by the *number of beneficiaries* that have elected to receive hospice care from the given hospice program during that fiscal year.   The per patient cap of $6,500 is adjusted annually using the Consumer Price Index to account for inflation; for fiscal year 2006, it was $20,585.39, and for fiscal year 2007, it was $21,410.04.

The original, per patient cap of $6,500 is not at issue in this case; instead, the parties dispute the proper method for calculating the number of beneficiaries.   The statute provides, in relevant part, that:

> the number of Medicare beneficiaries in a hospice program in an accounting year is equal to the number of individuals who have made an election . . . with respect to the

---

1. The payments made to hospice care providers, the reimbursement cap calculations, and the repayment demands are actually handled by a fiscal intermediary.   A **fiscal intermediary** is an insurance company that contracts with the Secretary of HHS to act on her behalf in processing, reviewing, and paying Medicare claims submitted by providers. *See Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1056 n. 5 (5th Cir. 1985) (citing 42 U.S.C. § 1395h).

hospice program and have been provided hospice care by (or under arrangements made by) the hospice program under this part in the accounting year, *such number reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year or under a plan of care established by another hospice program.*

42 U.S.C. § 1395f(i)(2)(C) (emphasis added).  The statute requires that when calculating the number of beneficiaries for a hospice care provider in a given fiscal year, the number should be "reduced to reflect the proportion of hospice care" that was actually provided to the program's patients, as opposed to care provided to the patient by another hospice care provider or during another year. Thus, if a beneficiary received care for only part of the year—either because he was with another hospice care provider or did not elect hospice care for the entire year—then, in calculating the hospice care provider's reimbursement cap, the number of beneficiaries must be proportionally reduced to reflect this situation.

The Secretary of HHS promulgated two regulations providing specific methodologies for calculating the number of beneficiaries under 42 U.S.C. § 1395f(i)(2)(C).  Instead of attempting to perform a fractional adjustment of the amount of care that each beneficiary received in a particular year, the Secretary decided that it would be easier to reflect the proportion of hospice care actually provided in a given year by counting "each beneficiary only in the reporting year in which the preponderance of the hospice care would be expected to be furnished." 48 Fed. Reg. 38146, 38158 (Aug. 22, 1983).  The Secretary, thus, proposed the following regulation, which provides that, in calculating the number of Medicare beneficiaries receiving hospice care in a given fiscal year, one should only include:

> Those Medicare beneficiaries who have not previously been included in calculation of any hospice cap and who have filed an election to receive hospice care . . . from the hospice during the period beginning September 28 (35 days before the beginning of the cap period) and ending on September 27 (35 days before the end of the cap period).

4

42 C.F.R. § 418.309(b)(1).

The regulation contemplates an average length of hospice services per patient of 70 days. Consequently, a hospice care provider will receive 100% of the statutory allowance during the current fiscal year for patients electing to receive hospice care on or before September 27 (35 days before the end of the fiscal year); and a hospice care provider will receive 100% of the statutory allowance during the subsequent year for patients electing to receive hospice care after September 27.  The Secretary of HHS believed that this method would "produce a reasonable estimate of the proportionate number of beneficiaries to be counted in each cap period," simplify the process for calculating the number of beneficiaries for a given accounting year, and result in less delay in the calculation of the hospice care providers' reimbursement caps. *See* 48 Fed. Reg. 38146, 38158 (Aug. 22, 1983).  Thus, it was hoped that the regulation would "achieve the intent of the statute without being burdensome." *Id*.

For many years, this simplified method of calculating the statutory cap appears to have functioned well, and most hospice care providers were able to provide services without exceeding their caps.  Recently, however, increasing numbers of hospice care providers from states throughout the nation have been exceeding their caps. *See generally* Marc Adler, *The Government's Cap on Dying: Why Is the Medicare Hospice Benefit Cap Being Exceeded and How Should This Problem Be Addressed?*, 4 NAELA J. 201 (2008).  Plaintiff Hospice of New Mexico believes that federal regulation 42 C.F.R. § 418.309(b)(1) is to blame.  While the regulation contemplates an average length of hospice care of 70 days, Plaintiff asserts that the average length of care for a Hospice of New Mexico patient during fiscal years 2006 and 2007 was 193 days; and during 2005, the average length of care for hospice patients in fifteen states exceeded 70 days, including New Mexico, which had an average of 101 days.  Plaintiff argues that this shift to longer periods of hospice care has

5

resulted in too many beneficiaries being allocated to prior years, and as a result, the reimbursement cap for subsequent years being underestimated.

Nonetheless, Defendant disputes that it is the increasing length of hospice stays in many states that has affected the calculation of the reimbursement cap under 42 C.F.R. § 418.309(b)(1), arguing instead that some other factor is causing hospice care providers to exceed their reimbursement caps. Defendant contends that, even with an average length of care longer than 70 days, where there is a steady distribution of hospice care elections over the course of a year, the regulation will accurately reflect the proportion of hospice care provided in each accounting year and comply with the statute. Defendant has not, however, provided an alternate theory or mechanism to explain why so many hospice care providers are exceeding their statutory reimbursement caps.

### B.    Hospice of New Mexico, LLC

Plaintiff Hospice of New Mexico is a Medicare certified hospice provider based in Albuquerque, New Mexico. Hospice of New Mexico began serving patients in the Albuquerque area in July 2004, and since that time, it has provided services to more than 1,000 patients. During its first fiscal year (July 2004 through Oct. 31, 2005), Hospice of New Mexico's cap allowances exceeded its Medicare revenue by $700,000. This surplus, however, could not be carried forward to subsequent years. Many of Hospice of New Mexico's patients that elected to receive hospice care during fiscal year 2005 continued to receive services during fiscal year 2006 (Nov. 1, 2005 through Oct. 31, 2006). Because many of these patients had already been allocated to fiscal year 2005 under 42 C.F.R. § 418.309(b)(1), there was no cap allocation for them during fiscal year 2006; and therefore, under the current regulation, Hospice of New Mexico was not entitled to receive Medicare reimbursements for these patients during fiscal year 2006.

6

Medicare paid Hospice of New Mexico for the services it provided to all its beneficiaries during fiscal year 2006; but, in calculating the reimbursement cap for fiscal year 2006, Medicare beneficiaries who elected to receive hospice care prior to September 28, 2005 or after September 27, 2006 were not counted.  On April 22, 2008, HHS sent Hospice of New Mexico a demand for repayment of $793,934 for exceeding its fiscal year 2006 cap.  Plaintiff Hospice of New Mexico claims that if HHS had followed Congress' statutory mandate and used a fractional method of calculating its Medicare reimbursement cap as required by Congress, it would have had a higher cap for fiscal years 2006 and 2007, and its liability would have been materially reduced.

Hospice of New Mexico paid HHS' repayment demand for fiscal year 2006, but it filed an appeal regarding its fiscal year 2006 cap determination with the Provider Reimbursement Review Board (PRRB) pursuant to 42 U.S.C. § 1395oo challenging the validity of 42 C.F.R. § 418.309(b)(1).  The PRRB, however, lacks jurisdiction to determine the validity of a federal regulation; and therefore, Plaintiff Hospice of New Mexico applied for leave to seek expedited judicial review of its appeal.  On December 16, 2008, the PRRB granted Plaintiff's request for expedited judicial review, finding that there were no material facts in dispute, the amount in controversy exceeded $10,000, and Plaintiff's appeal involved principally a legal challenge to the validity of the regulation.  Plaintiff Hospice of New Mexico then filed a complaint in the United States District Court for the District of New Mexico on February 13, 2009.

During fiscal year 2007 (Nov. 1, 2006 through Oct. 31, 2007), Hospice of New Mexico continued to serve patients who had elected to receive hospice care during previous fiscal years. Medicare again paid Hospice of New Mexico for the services it provided to all of its beneficiaries during fiscal year 2007; however, in calculating the reimbursement cap for fiscal year 2007, those beneficiaries who elected hospice care prior to September 28, 2006 or after September 27, 2007

were not counted.  HHS sent Hospice of New Mexico a demand for repayment of $1,010,593.00 on May 27, 2009 for exceeding its fiscal year 2007 cap.  Again, Plaintiff argues that the current regulation materially reduced its reimbursement cap, and as a result, it suffered material prejudice due to Defendant's failure to follow Congress' statutory mandate.

Plaintiff Hospice of New Mexico again filed an appeal with the PRRB challenging the validity of 42 C.F.R. § 418.309(b)(1) and requesting expedited judicial review.  On July 24, 2009, the PRRB once again granted Plaintiff's request, finding that there were no material facts in dispute, the amount in controversy exceeded $10,000, and Plaintiff's appeal involved principally a legal challenge to the validity of the regulation.  Plaintiff filed an amended complaint on August 25, 2009 that included the second claim for fiscal year 2007.  Plaintiff Hospice of New Mexico was unable to pay HHS' repayment demand for fiscal year 2007 and applied for an extended repayment plan, which requires Plaintiff to repay the money with interest.

In its Amended Complaint, Plaintiff Hospice of New Mexico claims that federal regulation 42 C.F.R. § 418.309(b)(1) is invalid.  Plaintiff asserts that because the regulation only contemplates an average length of hospice care of 70 days, too many hospice patients are being allocated to prior years, along with their Medicare benefits, resulting in statutory cap that does not accurately reflect the proportion of care that was provided to its patients during fiscal years 2006 and 2007. Additionally, Plaintiff argues that the problem with the regulation is further compounded because patients allocated to previous years have lower allowances due to the fact that the per patient allowance is adjusted annually for inflation.  Therefore, Plaintiff contends that the current regulation directly contravenes Congress' intent that Medicare reimbursements to hospice care providers proportionally reflect the benefits provided across years of service and requests the following relief:

    1.     A declaration that 42 C.F.R. § 418.309(b)(1) is invalid.

2.      A declaration that HHS' calculation of Hospice of New Mexico's cap liability for fiscal year 2006 is invalid.

3.      A declaration that HHS' calculation of Hospice of New Mexico's cap liability for fiscal year 2007 is invalid.

4.      An order requiring HHS to return to Hospice of New Mexico, with interest, all monies Hospice of New Mexico has paid towards repayment of the alleged 2006 and 2007 overpayments.

5.      Pending final resolution of this matter, a preliminary injunction enjoining HHS from: (a) enforcing the 2007 repayment demand; and/or (b) calculating subsequent fiscal year alleged overpayments relating to Hospice of New Mexico pursuant to the current version of 42 C.F.R. § 418.309(b)(1).

6.      An order enjoining HHS from prospective use of 42 C.F.R. § 418.309(b)(1) in calculating the hospice cap liability of Hospice of New Mexico or any other hospice provider.

7.      An order requiring HHS to pay legal fees and costs of suit.

8.      Such other and further relief as the Court may consider appropriate.

(Pl.'s First Amended Compl., Section VII. Relief Requested, ¶¶ 1–8.)

Defendant, nevertheless, refutes Plaintiff's claim that 42 C.F.R. § 418.309(b)(1) is responsible for Plaintiff exceeding its statutory cap, arguing that "[a]n average length of stay longer than seventy days would not affect the proportionality of this method of calculation." (Doc. 14, p. 7.) Defendant contends that where there is "a steady distribution of hospice care elections over the course of a year, the regulation will effectively 'reflect the proportion' of hospice care provided in each accounting year." (Doc. 14, p. 7.) Defendant did not, however, provide any additional explanation or corroborating evidence for this assertion, either in her memoranda or during oral arguments before this Court.

Defendant additionally argues that the regulation is necessary to simplify the calculation of reimbursement caps because Medicare beneficiaries may elect to receive hospice care over a period of many years. Because under 42 U.S.C. § 1395d(a)(4) and (d)(1) a terminally ill Medicare beneficiary is entitled to receive Medicare hospice benefits for as long as he or she continues to elect hospice care over treatment, and because this care can stretch over several periods and many years,

9

Defendant argues that without the current regulation, a hospice care provider's reimbursement cap could only be calculated at the end of a beneficiary's stay—i.e., after his or her death—and waiting for each beneficiary to die to calculate the cap, or constantly recalculating the cap, would lead to financial uncertainty for the hospice care providers and significantly delay repayments to Medicare. Again, beyond her contention that invalidating the regulation would impose an enormous administrative burden on the agency, Defendant did not provide any explanation or evidence to corroborate these assertions.

The Court also notes that in order to comply with 42 U.S.C. § 1395d(a)(4) and (d)(1)—which provides that a terminally ill Medicare beneficiary is entitled to Medicare hospice benefits as long as he or she continues to elect hospice care—it would appear that a Medicare beneficiary who elects to receive hospice care over a period of more than one year must be counted, or at least a portion of his or her care reflected, in each fiscal year in which he or she elects to receive hospice care. If HHS is allocating benefits based solely on the date that a beneficiary elects hospice care and not providing benefits for additional years of care, then this would appear to be in direct contravention of 42 U.S.C. § 1395d(a)(4) and (d)(1). Admittedly, the majority of hospice patients pass within the first year; however, by statute, terminally ill patients are entitled to continue to receive Medicare benefits for hospice care as long as they continue to make that election. Under the current regulation, however, it is not apparent that hospice care providers are being compensated for beneficiaries who elect to receive hospice care over a period of several years, even if, as Defendant contends, there is a steady distribution of hospice care elections.

One can imagine the following situation: A terminally ill patient elects to receive hospice care on August 31, 2006. The fiscal year for calculating Medicare benefits ends October 31, 2006. Under the current regulation, because the patient elected to receive hospice care before the

September 27 cutoff, HHS would allocate his entire $20,585.39 individual benefits cap to 2006. Under Plaintiff's proposed fractional method of calculating benefits, however, only a fraction of the $20,585.39 cap would be allocated to fiscal year 2006. Since the beneficiary received hospice care for only two out of the twelve months of the year, $3,430.90—one-sixth of the $20,585.39 reimbursement cap—would be allocated to 2006.

The next year, the beneficiary continues to elect hospice care throughout fiscal year 2007, and then he dies on October 31, 2007. Under the current regulation, it does not appear that HHS would count the beneficiary as having received any care during 2007. Under Plaintiff's proposed fractional method, however, HHS would include the beneficiary's entire individual cap amount of $21,410.04 for fiscal year 2007 when determining the hospice care provider's reimbursement cap. This hypothetical clearly shows that under the current regulation, at least on a patient-by-patient basis, benefit caps will be dramatically overestimated for some years and dramatically underestimated for others.

Plaintiff's proposed fractional method clearly complies with Congress' statutory mandate. In fact, it is the method that HHS currently employs when dealing with beneficiaries who have received hospice care from more than one hospice care provider in a given fiscal year. *See* 42 C.F.R. § 418.309(b)(2) ("In the case in which a beneficiary has elected to receive care from more than one hospice, each hospice includes in its number of Medicare beneficiaries only that fraction which represents the portion of a patient's total stay in all hospices that was spent in that hospice."). Nonetheless, Defendant claims that this fractional method of calculation is too cumbersome to use with beneficiaries who receive hospice care during multiple fiscal years. Defendant argues that this method works for beneficiaries who move between hospices because these cases are extremely rare; therefore, the administrative burden is lower, and they do not significantly affect the overall cap

11

calculation for hospice care providers. *See* 48 Fed. Reg. 38146, 38158 (Aug. 22, 1983) ("we expect that the situation of beneficiaries changing to other hospices would occur infrequently; thus, we do not anticipate that the effect on hospice payments would be significant").

     **D.**    **District Court Cases**

This Court is not the first to confront a challenge to the validity of 42 C.F.R. § 418.309(b)(1) by a hospice care provider. This is an increasingly important issue with national implications, and several courts from various districts have ruled on similar motions in recent years. What follows is a summary of the cases this Court reviewed in reaching its decision. The courts that have confronted this issue have generally either remanded to the PRRB for additional factual findings or found the regulation to be invalid.

Soujourn Care, Inc. vs. Leavitt, No. 07-CV-375-GKF-PJC (N.D. Okla. Feb. 13, 2007). The district court found that the regulation was invalid and did not comport with the statute and granted Plaintiff's motion for summary judgment. The court then remanded the matter to the PRRB to determine what monetary damages plaintiff may have suffered. Both parties appealed, and the case is now on appeal before the Tenth Circuit.

Heart to Heart Hospice, Inc. v. Leavitt, No. 1:07-CV-289-M-D, 2009 WL 279099 (N.D. Miss. Feb. 5, 2009). In this case, the district court denied both plaintiff's and defendant's motions for summary judgment. The court noted that plaintiff likely had standing and acknowledged plaintiff's concerns with the statute. Additionally, the court seemed to agree with Judge Frizzel's decision in *Soujourn* that the regulation was invalid, but it did not invalidate it; instead, the court deferred to HHS and/or Congress, stating that it "was not prepared, at this juncture, to grant the relief sought by either party." *Id.* at *4. The court remanded the case to the PRRB for additional hearings, finding that plaintiff had "neglected to establish the kind of factual record which would

12

allow it to receive any tangible recovery in this case." *Id*. at *6.

Compassionate Care Hospice v. Sebelius, No. CIV-09-28-C, 2009 WL 2163503 (W.D. Okla. July 10, 2009).  Plaintiff filed an action seeking a declaration that the regulation was invalid, that HHS' prior calculation of Compassionate Care's cap for fiscal year 2006 was invalid, and an order requiring HHS to return all monies that Compassionate Care overpaid to Medicare.  Defendant sought dismissal of the case under Federal Rule of Civil Procedure 12(b)(1).  Court denied defendant's motion to dismiss finding that plaintiff had pled sufficient facts to demonstrate Article III standing.  The district court has not yet ruled on the merits of the case.

Los Angeles Haven Hospice, Inc. v. Leavitt, No. 2:08-cv-004469-GW-RZ (C.D. Cal. July 13, 2009).  Plaintiff filed action seeking declaration that regulation was invalid and requesting restitutionary and injunctive relief.  The district court found that plaintiff had standing to challenge the validity of the regulation and then granted plaintiff's motion for summary judgment, finding that the regulation was invalid.  The court then required further presentation as to exactly what forms of relief plaintiff was seeking and whether they were appropriate for the court to award.  The court also entered a nationwide injunction enjoining HHS from using the current regulation to calculate hospice cap liability for any hospice.  HHS appealed the decision, and the court stayed the injunction pending the appeal.

Autumn Bridge, L.L.C. v. Sebelius, No. 5:08-cv-00819-F (W.D. Okla. Aug. 10, 2009). Plaintiff requested that the court declare the statute invalid, vacate the regulation, enjoin HHS from using the regulation, invalidate HHS' prior calculations under the regulation, and restore all sums overpaid by plaintiff.  Both parties filed cross-motions for summary judgment.  The court denied the parties' motions for summary judgment and remanded the case to the PRRB for further findings, specifically to determine the extent of plaintiff's alleged injuries.  Although the court recognized that

Autumn Bridge likely had standing, it declined to address that issue or the merits of the case, noting that the PRRB had not performed any analysis to determine whether there was $10,000 in controversy. Once the PRRB had made additional findings, the court was confident it could address both issues.

American Hospice, Inc. v. Sebelius, No. 1:08-cv-01879-JEO (N.D. Ala. Jan. 27, 2010). Plaintiff American Hospice filed an action with the district court seeking declaratory judgment that the regulation was invalid as it conflicted with 42 U.S.C. § 1395f(i)(2)(C). Parties then filed cross-motions for summary judgment. HHS argued that American lacked Article III standing, and therefore, the action should be dismissed. The court found that "[b]ecause HHS [had] not carried its burden to demonstrate that American [would] be unable to meet its burden at trial to prove standing, no burden shifted to American under Rule 56(e) to offer evidence supporting the allegations in its complaint on the issue." Id. at 21. American also sought summary judgment, requesting that the court declare the regulation invalid and order HHS to refund with interest all monies overpaid for fiscal year 2006, in addition to other relief. The court found that since American would bear the burden of proving standing at trial, it likewise bore the burden of presenting evidence demonstrating standing on its motion for summary judgment. Because American failed to establish all three elements of standing on summary judgment, the court denied its motion for summary judgment.

Lion Health Services, Inc. v. Sebelius, No. 4:09-CV-493-A (N.D. Tex. Feb. 22, 2010). Plaintiff sought a declaration that the regulation was unlawful, an order enjoining the Secretary of HHS from using 42 C.F.R. § 418.309(b)(1), and an order requiring the Secretary to return all repayments made by plaintiff during 2006 and 2007. The court found that plaintiff had standing and had suffered an injury in fact because the repayment amounts were "calculated using a method

14

other than the method specified by Congress." *Id*. at 10.  The court then went on to find that Congress clearly expressed its intent about how the calculation should be made in 42 U.S.C. § 1395f(i)(2)(C): "By its plain language, the statutory requirement that the number be 'reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year' can only be accomplished in one way . . . ." *Id*. at 13.  Having found the regulation invalid, the court enjoined the Secretary from enforcing any overpayment determinations made pursuant to the regulation, enjoined the Secretary from using the regulation to calculate reimbursement caps for hospice care providers, and required the Secretary to refund all monies paid by plaintiff to the Medicare program for fiscal years 2006 and 2007.

## III.    STANDARDS OF REVIEW

### A.    Summary Judgment

Summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1207 (10th Cir. 2006) (finding that summary judgment is appropriate "only where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law") (internal quotations omitted).

"[I]t is important to note that cross-motions for summary judgment do not automatically empower the court to dispense with the determination whether questions of material fact exist.  They require no less careful scrutiny than an individual motion.  [The court] must be convinced in all instances that the issues before [it] may be resolved as a matter of law." *Missouri Pacific R. Co. v. Kansas Gas and Elec. Co.*, 862 F.2d 796, 799 (10th Cir. 1988) (internal quotations and citation

omitted).  It is up to the trial court to determine "whether the evidence presents a sufficient disagreement to" preclude summary judgment "or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Furthermore, when dealing with cross-motions for summary judgment, the court must analyze each motion individually and on its own merits. *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir.1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

### B.     Judicial Review of Agency Regulations Under the APA

This Court has been asked to determine the validity of 42 C.F.R. § 418.309(b)(1).  Plaintiff asserts that the regulation is invalid and contrary to Congress' express statutory mandate in 42 U.S.C. § 1395f(i)(2)(C).  Under 42 U.S.C. § 1395oo(f)(1), Congress specifically provided for judicial review of HHS regulations by a federal district court.  Congress also required that the review be governed by "the applicable provisions under chapter 7 Title 5," which describes the provisions for judicial review under the Administrative Procedure Act (APA).  The APA imposes certain limitations on a district court when reviewing agency action. *See* 5 U.S.C. § 701, *et seq.*

Because Plaintiff claims that the Secretary's regulation "is not in accordance with the express language of the Medicare Act, our review is governed by the familiar test set forth in *Chevron v. Natural Resources Defense Council, Inc.*," 467 U.S. 837 (1984). *St. Mark's Charities Liquidating Trust v. Shalala*, 141 F.3d 978, 980 (10th Cir. 1998).  Under *Chevron*, the reviewing court must first ask "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842.  If Congress' intent is clear, the reviewing court is not to give any deference to the Secretary's interpretation, but "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843.

16

However, where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. Additionally, where Congress has "left a gap for the agency to fill," either implicitly or explicitly, the Secretary's regulation is "given controlling weight." *Id*. at 843–44.

## IV.   LEGAL ANALYSIS

### A.   Article III Standing and Jurisdiction

Before addressing the merits of the parties' motions for summary judgment, the Court must first determine whether Plaintiff has standing to bring the action. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–101 (1988). Article III, Section 2 of the U.S. Constitution requires in every case that there be an actual case or controversy. *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *Allen v. Wright*, 468 U.S. 737, 750 (1984). There are three essential elements to constitutional standing: (1) injury in fact—plaintiff must show that he has suffered a harm that is concrete and actual; (2) causation—plaintiff must show a fairly traceable connection between the injury and defendant's conduct; and (3) redressability—the requested relief must address the alleged injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Citizens for a Better Env't*, 523 U.S. at 103; *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1241 (10th Cir. 2008). Plaintiff bears the burden of establishing standing. *Defenders of Wildlife*, 504 U.S. at 561.

Defendant argues that this Court lacks standing because "Plaintiff's injury does not establish standing nor meet the minimum amount in controversy of $10,000" as required by 42 U.S.C. § 1395oo(a)(2). (Doc. 14, p. 21.) Plaintiff counters that the PRRB already found that the amount in controversy exceeds $10,000. (Doc. 23, p. 2.) However, this Court must make its own determination of jurisdiction. *See Huerta v. Gonzales*, 443 F.3d 753, 755 (10th Cir. 2006); *Holt v.*

17

*United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).  To support its claim that it has been injured by the alleged invalid regulation, Plaintiff submitted a Supplemental Declaration of Cathy Conrad [Administrator of Hospice of New Mexico] in Support of Plaintiff's Opposition to HHS' Motion for Summary Judgment (Doc. 24) showing that HHS underestimated Plaintiff Hospice of New Mexico's reimbursement cap for fiscal year 2007 by more than $500,000.[2]

The Court finds that Plaintiff Hospice of New Mexico has adduced sufficient evidence to establish that it is entitled to keep at least a portion of the repayment demands for fiscal years 2006 and 2007. *See Ford v. NYLCare Health Plans of the Gulf Coast, Inc.*, 301 F.3d 329, 332–33 (5th Cir. 2002) ("at the summary judgment stage, 'the plaintiff can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts' validating his right to standing" (quoting *Defenders of Wildlife*, 504 U.S. at 561)).  Plaintiff's Supplemental Declaration (Doc. 24) indicates that if the fractional method described in 42 C.F.R. § 418.309(b)(2) had been used to calculate the number of beneficiaries for fiscal years 2006 and 2007 instead of the method required by 42 C.F.R. § 418.309(b)(1), Plaintiff's reimbursement cap would have been increased by more than $500,000. Thus, Plaintiff has shown that it has suffered an injury that is concrete and actual, and that the injury was a direct result of HHS' application of 42 C.F.R. § 418.309(b)(1), satisfying the first two requirements of standing—injury in fact and causation.

The third requirement, redressability, is more difficult.  Plaintiff requests several forms of relief, including that HHS return with interest all repayments made by Hospice of New Mexico for fiscal years 2006 and 2007.  Granting this type of monetary relief would be extremely difficult for

---

2. From Plaintiff's calculations, it appears that HHS underestimated the cap by $531,529.07 for fiscal year 2007. When this is subtracted from the repayment demand made by HHS of $1,010,593 for fiscal year 2007, it appears that Plaintiff would still owe Medicare $479,063.93.

this Court and likely require extensive fact-finding and hearings.  This is not the proper role for a district court reviewing agency action.  Nonetheless, HHS' application of the allegedly invalid regulation is an integral part of the injury suffered by Plaintiff, and if the Court were to find that the regulation is invalid, this would at least partially redress Plaintiff's injury. *See Larson v. Valente*, 456 U.S. 228, 243 n. 15 (1982) (noting that plaintiff "need not show that a favorable decision will relieve his every injury").

Having determined that Plaintiff has satisfied the constitutional standing requirements for federal jurisdiction under Article III, the Court must now determine whether Congress has provided the Court a statutory grant of jurisdiction. *See Kline v. Burke Construction Co.*, 260 U.S. 226, 233–34 (1922); *Commodity Futures Trading Comm'n v. Nahas*, 738 F.2d 487, 492 (D.C. Cir. 1984) ("The Court must [] scrupulously observe the precise jurisdictional limits prescribed by Congress."). Defendant correctly observes that this Court's jurisdiction "extends only so far as Congress provides by statute." (Doc. 22, p. 4.)  In the case at hand, 42 U.S.C. § 1395oo(f) provides a statutory grant of jurisdiction for this Court to review the validity of 42 C.F.R. § 418.309(b)(1):

> [Hospice Care] Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the [PRRB] determines . . . that it is without authority to decide the question . . . .  Such action shall be brought in the district court of the United States for the judicial district in which the provider is located . . . .

Additionally, Plaintiff has provided sufficient proof at the summary judgment stage of the minimum amount in controversy required by 42 U.S.C. § 1395oo(a)(2).  Therefore, the Court finds that Plaintiff has standing, and the Court therefore has subject matter jurisdiction to hear this case.

**B.**      ***Chevron* Analysis**

The Secretary of HHS promulgated two rules instructing the agency on how to carry out a proportional reduction of the number of hospice beneficiaries under 42 U.S.C. § 1395f(i)(2)(C): (1) a rule applying in cases where the beneficiary was provided care by the same hospice care provider, but for only part of the year, 42 C.F.R. § 418.309(b)(1); and (2) a rule applying in cases where the beneficiary received care from more than one hospice provider during the fiscal year, 42 C.F.R. § 418.309(b)(2). Plaintiff challenges the validity of the first rule, which provides that in calculating the number of beneficiaries for a given year, one should only include:

> Those Medicare beneficiaries who have not previously been included in calculation of any hospice cap and who have filed an election to receive hospice care . . . from the hospice during the period beginning September 28 (35 days before the beginning of the cap period) and ending on September 27 (35 days before the end of the cap period).

42 C.F.R. § 418.309(b)(1). Plaintiff argues that this regulation is invalid because it directly conflicts with 42 U.S.C. § 1395f(i)(2)(C), which provides in relevant part:

> [T]he number of Medicare beneficiaries in a hospice program in an accounting year is equal to the number of individuals who have made an election . . . with respect to the hospice program and have been provided hospice care by (or under arrangements made by) the hospice program under this part in the accounting year, *such number reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year or under a plan of care established by another hospice program.*

Because Plaintiff claims that the Secretary's regulation "is not in accordance with the express language of the Medicare Act, our review is governed by the familiar test set forth in *Chevron.*" *St. Mark's Charities*, 141 F.3d at 980. The Court must first look to see "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842.

Congress provided that when calculating the reimbursement cap for a hospice care provider for a given fiscal year, the number of hospice beneficiaries should be "reduced to reflect the

proportion of hospice care that each such individual was provided in a previous or subsequent accounting year or under a plan of care established by another hospice program." 42 U.S.C. § 1395f(i)(2)(C).  Plaintiff argues that the intent of Congress in Section 1395f(i)(2)(C) is clear and unambiguous and that HHS is therefore required to use the fractional method of calculation described in 42 C.F.R. § 418.309(b)(2) to determine the number of beneficiaries that elected to receive hospice care for only part of the year.  Defendant, however, argues that the phrase "reflect the proportion" is ambiguous, and Congress left it up to the Secretary of HHS to determine precisely how the number of beneficiaries should be calculated.  Because the intent of the statute can be satisfied through a variety of methodologies, Defendant argues that the Court must analyze the regulation under the second prong of *Chevron*, overturning the agency's action only if it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.

The Court starts its analysis under the first prong of *Chevron*.  To determine whether or not Congress' intent was clear, the Court must engage in statutory interpretation.  "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n. 9.  Therefore, the question for the Court is whether Congress clearly expressed in 42 U.S.C. § 1395f(i)(2)(C) how HHS should reduce the number of beneficiaries. *See Lion Health Services*, No. 4:09-CV-493-A, at 12–13.

"As in all statutory construction cases, we begin with the language of the statute. The first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).  The Court should consider

21

the language of the statute in its plain, ordinary, or natural sense, and if the meaning of the statute

is then clear on its face, the Court need go no further. *Stenberg v. Carhart*, 530 U.S. 914, 992 (2000)

(Thomas, J. dissenting); *FDIC v. Meyer*, 510 U.S. 471, 476 (1994); *Smith v. United States*, 508 U.S.

223, 228 (1993); *United States v. Morton*, 467 U.S. 822, 828 (1984).  The key phrase that the parties

in this and other hospice cases have focused on in determining whether Section 1395f(i)(2)(C) is

clear and unambiguous is "reflect the proportion."  Plaintiff argues that this phrase clearly expressed

Congress' intent that HHS use a fractional method of calculation; however, Defendant argues that

the phrase was intentionally ambiguous, and therefore, Congress intended for HHS to promulgate

a regulation.

The word *reflect* can have various meanings depending on how it is used.  When read in the

context of the statute, however, the intended meaning is clear. *See Robinson*, 519 U.S. at 341;

*Morton*, 467 U.S. at 828 ("We do not ... construe statutory phrases in isolation; we read statutes as

a whole"); *Lion Health Services*, No. 4:09-CV-493-A, at 15 ("[a]lthough 'reflect' and 'proportion'

may be ambiguous in other contexts, the meaning of those terms as they are used in § 1395f(i)(2)(C)

is made clear by reference to the words immediately surrounding them in that statute.").  Within the

context of Section 1395f(i)(2)(C), the word reflect merely means to express, to indicate, or to make

apparent.  Thus, Congress instructed that the number of beneficiaries should be reduced to express

the fact that a proportion of hospice care for each individual may have been provided in a different

year or by another hospice program.

Defendant argues that reflect implies a certain degree of imprecision, requiring only "an

estimate" of the number of beneficiaries, not a precise fractional calculation.  Defendant relies on

the Seventh Circuit securities case, *Bd. of Trade of Chicago v. SEC*, where the court found that in

order for an index to reflect the market, it was sufficient that there was a 92% "long-term correlation between the indexes and the larger portfolios." 187 F.3d 713, 719 (7th Cir. 1999). Contrary to Defendant's assertion that the word reflect requires only a rough estimate, the Court instead understands the Seventh Circuit as having interpreted the word to require a certain degree of precision and accuracy. A 92% correlation would indicate a fairly substantial degree of precision in the index, at least something beyond a mere estimate. Granted, the index in *Bd. of Trade of Chicago* did not represent an exact mirror image of the market; however, it provided a better reflection of the market than the Secretary's regulation does of the number of beneficiaries.

Indeed, a reflection is not always perfect, as imperfections in the reflecting surface will create imperfections in the reflected image; thus, to reflect in its ordinary, plain meaning may not require a perfect calculation. Nonetheless, a reflection generally provides a near flawless reproduction of the original, and when it doesn't, one would say the image has been distorted. From Plaintiff's calculations, it appears that Defendant may have overestimated the repayment demand for Hospice of New Mexico for 2007 by more than 50%. (Doc. 24.) Such a large degree of error does not accurately reflect the number of beneficiaries; rather, it completely distorts the repayment demand made of the hospice care provider.

Defendant next argues that the word *proportion* is also ambiguous. Defendant relies on a case from the Eighth Circuit in which the court found that "[t]he term 'in proportion to' is not precise; it may mean any one of several things." *First National Bank of Milaca v. Heimann*, 572 F.2d 1244, 1249 (8th Cir. 1978). This argument is not at all persuasive, however, as the context of the Eighth Circuit case is completely different. The phrase "in proportion to," as used in *First National Bank*, means "in comparison to"—as in, his head is very large in proportion to his body.

23

The word "proportion," within the context of 42 U.S.C. § 1395f(i)(2)(C), refers to the mathematical relation of a part to the whole; in other words, it specifies a ratio or a fraction. Thus, giving the language of the statute its plain and ordinary meaning, the Court understands Congress intended that the number of beneficiaries be reduced to *indicate the fraction* of "hospice care that each such individual was provided in a previous or subsequent accounting year."

The phrase "each such individual" indicates that the reduction should be carried out on an individual basis for each hospice patient, not estimated by allocating patients to different years based upon the date they elected to receive hospice care. Furthermore, the statute requires that the proportional reduction of the number of beneficiaries reflect hospice care "provided in a previous or subsequent accounting year." In other words, the statute requires that each hospice patient's benefit cap allowance be allocated across years of service, not lumped into a single year in which care was provided, irrespective of the length of a patient's overall stay.

This interpretation of the language of 42 U.S.C. § 1395f(i)(2)(C) is further supported when one looks at "the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341; *see also Morton*, 467 U.S. at 828 ("We do not . . . construe statutory phrases in isolation; we read statutes as a whole"); *Dole Food Co. v. Patrickson*, 538 U.S. 468, 484 (2003) ("Statutory interpretation is not a game of blind man's bluff. Judges are free to consider statutory language in light of a statute's basic purposes." (Breyer, J., concurring in part and dissenting in part)). Provisions of the Medicare Act relating to Health Insurance for the Aged and Disabled are codified in Title 42, Chapter 7, Subchapter XVIII, Sections 1395—1395hhh of the United States Code. One of the Medicare benefits available to the aged and disabled described in these sections is hospice care. Section 1395d provides that a terminally ill Medicare beneficiary is entitled to Medicare benefits for hospice

care as long as he or she continues to elect hospice care. *See* 42 U.S.C. § 1395d(a)(4) and (d)(1). Therefore, a Medicare beneficiary who elects to receive hospice care over a period of more than one year must be counted—or at least a portion of his or her care reflected—in each fiscal year in which he or she elects to receive hospice care.  The Secretary's regulation simply does not provide for hospice patients who may receive care over multiple years, even though Congress clearly contemplated this eventuality.[3]

In conclusion, this Court finds that Congress' intent when it drafted 42 U.S.C. § 1395f(i)(2)(C) was clear and unambiguous, and 42 C.F.R. § 418.309(b)(1) does not comport with that intent.  The statute requires a fractional reduction of the number of Medicare beneficiaries to be performed on an individual basis and across as many years of service as the Medicare beneficiary remains eligible and continues to elect hospice care. *See Los Angeles Haven Hospice*, No. 2:08-cv-004469-GW-RZ, at 7–8 ("Congress unquestionably required that the number of Medicare beneficiaries be reduced to reflect 'the proportion' (not simply a proportion or an estimate, as Defendant would apparently have 'reflect' mean in this context) of hospice care that 'each such individual' (not individual in the aggregate) 'was provided in a previous or subsequent accounting year.'").  Under 42 C.F.R. § 418.309(b)(1), HHS is allocating benefits based solely on the date that a beneficiary elects hospice care and thereby merely estimating the proportion by which the number of beneficiaries should be reduced in a particular year.  In so doing, HHS is directly contravening

---

3. To be fair to the Secretary, Congress originally limited hospice care benefits to a 210 day maximum.  It was not until 1990 that Congress amended the Medicare Act to allow for longer periods of hospice care. *See* Pub. L. 101-508, § 4006(a) (1990).  However, by continuing to count beneficiaries in only one year, the Secretary has ignored the situation in which a terminally ill patient receives hospice care over a number of years.  As beneficiaries elect to receive hospice care for increasingly longer periods, it seems logical that this type of situation will become more and more common.  The spreadsheet provided by Hospice of New Mexico which accompanied its Supplemental Declaration (Doc. 24) indicates several Hospice of New Mexico patients that received care over two, three, four, or even five year periods.

Congress' intent by not allocating Medicare benefits on an individual basis, by not allocating benefits across years of service, and by not providing benefits for additional years of care.

In promulgating the regulation, the Secretary of HHS admitted that she decided not to follow what she understood to be Congress' intent because it would be too difficult:

> Although . . . the Act specifies that the cap amount is to be adjusted "to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year," such an adjustment would be difficult in that the proportion of the hospice stay occurring in any given year would not be known until the patient died or exhausted his or her hospice benefits.  We believe that the proposed alternative of counting the beneficiary in the reporting period where the beneficiary used most of the days of covered hospice care will achieve the intent of the statute without being burdensome.

48 Fed. Reg. 38146, 38158 (Aug. 22, 1983) (emphasis added).  By choosing to count beneficiaries in only the year in which HHS anticipated the majority of the hospice care would be furnished, the Secretary ignored Congress' statutory mandate.  Although the Secretary's regulation initially achieved results similar to what would have been achieved under a fractional method of calculation, and with less burden on the agency, the regulation clearly did not comport with Congress' intent. This failure has become apparent in recent years as hospice stays have become longer.

Several other district courts that have addressed this issue reached the same conclusion as this Court—that the statutory intent of Congress was clear and that the regulation does not comport with Congress' mandate.  *See Soujourn Care*, No. 07-CV-375-GKF-PJC, at 55 ("I simply don't believe that it follows the statutory mandate . . . ."); *Los Angeles Haven Hospice*, No. 2:08-cv-004469-GW-RZ, at 7–8 ("Here, the answer under the *Chevron* analysis is plain and the Court need not proceed beyond the initial inquiry . . . .   Congress has 'directly spoken' to this 'precise question.'"); *American Hospice*, No. 1:08-cv-01879-JEO, at 58 ("42 C.F.R. § 418.309(b)(1) fails

at the first step of the *Chevron* analysis, because it is contrary to the intent of Congress expressed in the plain and unambiguous language of the controlling statute."); *Lion Health Services*, No. 4:09-CV-493-A, at 13 ("Congress was clear about how the calculation should be made.").

### C.   Fifth Amendment Takings Claim

In its amended complaint, Plaintiff asserts that 42 C.F.R. § 418.309(b)(1) "amounts to an unlawful taking of private property for public use without just compensation in violation of the Fifth Amendment of the United States Constitution." (Doc. 11, § 8.)   In her motion for summary judgment, Defendant argues that Plaintiff's "claim has no legal basis and must be dismissed." (Doc. 14, p. 13.)   Plaintiff did not respond to Defendant's argument in its response.

The threshold question in a Takings Clause claim is whether Plaintiff has identified a cognizable property interest. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000 (1984).   "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.   He must have more than a unilateral expectation of it.   He must, instead have a legitimate claim of entitlement to it." *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577 (1972).   Plaintiff argues that where a doctor or other medical service provider voluntarily participates in a price-regulated government program (such as Medicare) in which beneficiaries are provided services and the service provider's compensation is then determined by a government statute or regulation, there can be no taking of property because there was no legal compulsion to provide the services, and therefore, no entitlement. *See, e.g.*, *Painter v. Shalala*, 97 F.3d 1351, 1357–58 (10th Cir. 1996) (finding physician did not have property interest in receiving Medicare payments in amount different from that set forth in fee schedule because the physician voluntarily provided the services and was aware of the amount he would be reimbursed); *Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir.

1993) ("where a service provider voluntarily participates in a price-regulated program or activity, there is no legal compulsion to provide service and thus there can be no taking"); *Minn. Ass'n of Health Care Facilities, Inc. v. Minn.*, 742 F.2d 442, 446 (8th Cir. 1984) (finding that state statute limiting fees that nursing homes may charge was not a taking because "the state does not require that nursing homes admit medical assistance residents and participate in the Medicaid Program"). Plaintiff has cited no contrary authority or presented any evidence to support its claim that 42 C.F.R. § 418.309(b)(1) amounts to an unlawful taking of private property in violation of the Fifth Amendment.  Therefore, Defendant's Motion for Summary Judgment with regard to Plaintiff's Fifth Amendment Takings Clause claim is granted.

## V.    RELIEF TO BE GRANTED

Plaintiff has requested the following relief:

1.    A declaration that 42 C.F.R. § 418.309(b)(1) is invalid.
2.    A declaration that HHS' calculation of Hospice of New Mexico's cap liability for fiscal year 2006 is invalid.
3.    A declaration that HHS' calculation of Hospice of New Mexico's cap liability for fiscal year 2007 is invalid.
4.    An order requiring HHS to return to Hospice of New Mexico, with interest, all monies Hospice of New Mexico has paid towards repayment of the alleged 2006 and 2007 overpayments.
5.    Pending final resolution of this matter, a preliminary injunction enjoining HHS from: (a) enforcing the 2007 repayment demand; and/or (b) calculating subsequent fiscal year alleged overpayments relating to Hospice of New Mexico pursuant to the current version of 42 C.F.R. § 418.309(b)(1).
6.    An order enjoining HHS from prospective use of 42 C.F.R. § 418.309(b)(1) in calculating the hospice cap liability of Hospice of New Mexico or any other hospice provider.
7.    An order requiring HHS to pay legal fees and costs of suit.
8.    Such other and further relief as the Court may consider appropriate.

(Pl.'s First Amended Compl., Section VII. Relief Requested, ¶¶ 1–8.)

Granting Plaintiff's request for monetary relief would be extremely difficult for this Court

28

and likely require extensive fact-finding and hearings.  The Court has no information before it indicating that Plaintiff is entitled to a return of all, or any, of the payments it made to HHS for fiscal years 2006 and 2007.  Even using a fractional method of calculation to determine Hospice of New Mexico's statutory reimbursement cap, it is possible that Plaintiff exceeded its cap for fiscal years 2006 and 2007 and HHS is entitled to a repayment of some of the Medicare benefits it paid out to Hospice of New Mexico.  HHS is clearly better suited to performing these complex calculations than this Court.

The Court has only found that 42 C.F.R. § 418.309(b)(1) is invalid and Plaintiff would be better off under a fractional calculation as required by the statute.  The Court was only asked by the PRRB to review the validity of the regulation.  Having accomplished this task, the Court is confident that the agency will be able to determine whether Hospice of New Mexico is entitled to a monetary award, and if so, the amount of that award.  Therefore, the Court denies Plaintiff's request that HHS return to Hospice of New Mexico, with interest, all monies Hospice of New Mexico has paid toward the 2006 and 2007 repayment demands.  However, HHS must recalculate Hospice of New Mexico's reimbursement caps for fiscal years 2006 and 2007 using a fractional method of calculation as required by the statute and return any monies overpaid to HHS by Hospice of New Mexico for these years.  Conversely, if under the recalculated reimbursement caps, Hospice of New Mexico is found to have exceeded its annual cap for either of these years and to still owe money to HHS beyond what it has already repaid, then HHS may issue a modified repayment demand.

The Court now turns to Plaintiff's requested injunctive relief.  In addition to an injunction against HHS from using 42 C.F.R. § 418.309(b)(1) to calculate the hospice cap liability for Hospice of New Mexico, Plaintiff also requests that the Court impose a nationwide injunction.  "[I]njunctive

relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Additionally, nationwide injunctive relief is discouraged where it would "substantially thwart the development of important questions of law" and prevent other courts from ruling on the validity of the regulation. *United States v. Mendoza*, 464 U.S. 154, 160 (1984); *see also Virginia Society for Human Life, Inc. v. Federal Election Commission*, 263 F.3d 379, 393 (4th Cir. 2001). Thus, injunctive relief "should be carefully addressed to the circumstances of the case" and not any broader than necessary "to afford relief to the prevailing party." *Virginia Society for Human Life*, 263 F.3d at 393. Although this is clearly a nationwide problem, the Court does not have before it nationwide plaintiffs, and imposing such a broad injunction would be inappropriate.

The Court does believe, however, that injunctive relief against HHS as it relates to Hospice of New Mexico is appropriate. HHS is therefore enjoined from any continued enforcement of its 2007 repayment demand against Hospice of New Mexico and from any further use of 42 C.F.R. § 418.309(b)(1) to calculate Hospice of New Mexico's statutory reimbursement cap or to make repayment demands against Hospice of New Mexico. This limited injunctive relief adheres to the Supreme Court's requirement that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano*, 442 U.S. at 702.

## ORDER

**WHEREFORE**, a Memorandum Opinion having been entered this date, **IT IS HEREBY ORDERED AND DECLARED** that:

(1) Defendant's Motion for Summary Judgment (Doc. 13) is DENIED as it relates to

30

Plaintiff's alleged lack of standing;

(2) Defendant's Motion for Summary Judgment (Doc. 13) is GRANTED as it relates to Plaintiff's Fifth Amendment Takings Clause claim;

(3) 42 C.F.R. § 418.309(b)(1) is contrary to Congress' statutory intent and invalid, and therefore, Plaintiff's Motion for Summary Judgment (Doc. 15) is GRANTED;

(4) HHS is enjoined from any continued enforcement of its 2007 repayment demand against Hospice of New Mexico;

(5) HHS is enjoined from any further use of 42 C.F.R. § 418.309(b)(1) to calculate Hospice of New Mexico's statutory reimbursement cap for any past, present, or future accounting year;

(6) HHS is enjoined from any further use of 42 C.F.R. § 418.309(b)(1) to make repayment demands against Hospice of New Mexico for any past, present, or future accounting year; and

(7) HHS is to recalculate Hospice of New Mexico's statutory reimbursement caps for fiscal years 2006 and 2007 and return any monies overpaid to HHS by Hospice of New Mexico.



_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**